## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

WILLIE E. KEATON,

      Plaintiff,

    vs.

                                 Case No. C2-03-890
                                 Judge Edmund A. Sargus, Jr.
                                 Magistrate Judge Mark R. Abel

LUCENT TECHNOLOGIES, INC.,

      Defendant.

### OPINION AND ORDER

Plaintiff, Willie E. Keaton, brings this case against his former employer, Defendant, Lucent Technologies, Inc., alleging breach of a prior settlement agreement, promissory estoppel, breach of implied contract, retaliation and race discrimination. Defendant, Lucent Technologies, Inc., has filed a Motion for Summary Judgment asserting that no genuine issues of material fact remain for trial and that it is entitled to judgment as a matter of law with respect to each of Plaintiff's claims. For the reasons that follow, the Motion for Summary Judgment is granted as to all claims in Plaintiff's Complaint.

Also pending before the Court is Plaintiff's Motion for Leave to Amend his Complaint to assert a claim for wrongful discharge. Defendant opposes the Motion as futile and unduly prejudicial. Plaintiff's Motion for Leave to Amend is denied.

## MOTION FOR SUMMARY JUDGMENT

### I.

Plaintiff, Willie E. Keaton, is an African-American male. He began working for Western Electric Corporation on October 27, 1964. Western Electric later became part of AT&T Corporation ("AT&T"). Defendant Lucent Technologies, Inc.'s ("Lucent") is AT&T's successor in interest. Keaton worked continuously for more than forty (40) years with Lucent and its predecessors. On November 15, 2004, Keaton received notification that his position was being eliminated as part of a corporate downsizing.

Previously, in 1995, Keaton filed legal action against Lucent's predecessor, AT&T, for invasion of privacy, racial discrimination, including failure to promote, handicap discrimination, intentional and/or negligent infliction of emotional distress, defamation of character and loss of consortium. On February 5, 1998, Keaton and Lucent, as successor to AT&T, entered into a written settlement agreement resolving the litigation. Paragraph 11 of the agreement set forth an anti-retaliation provision, which states in full:

> Lucent Technologies, Inc. recognizes its obligations under the common and statutory law of the United States and the State of Ohio, including the statutes set forth in paragraph eight (8), not to take any adverse employment action against or retaliate against Keaton as a result of the litigation or settlement.

(Settlement Agmt., ¶ 11, Def's Exh. 1.) The settlement agreement also contained a waiver and release provision whereby Keaton waived any and all rights to file claims, lawsuits or otherwise to challenge Lucent's employment decisions occurring on or before the date of execution. (Settlement Agmt., ¶ 7.)

-2-

Lucent continuously employed Keaton after the execution of the settlement agreement in February 1998 for over seven years until his position was eliminated in 2004. From 1998 to 2001, Keaton worked as Administrative Services Manager. In his last position, explained more fully below, Lucent employed Keaton as a Lucent Real Estate ("LRE") manager, with a title of Property Manager, for its Columbus facility. Generally speaking, in that position, Keaton's primary responsibility involved managing certain administrative/office functions and personnel at the Columbus facility.

In July 2002, Colin Cameron became the Property Management Director for Lucent. In that position, Cameron was responsible for the Columbus facility, the facilities in Lisle/Napersville, Illinois and other Lucent properties around the country. Keaton began reporting directly to Cameron instead of Ken Wells, Keaton's previous immediate supervisor. Cameron was a D-level manager; Keaton was a B-level manager.[1]

In the Spring of 2004, Lucent's corporate Human Resources Group audited the duties and responsibilities of its real estate personnel throughout the country. During this audit, Human Resources determined that Keaton's duties did not match with his B-level Administrative Services Manager designation. Instead of reclassifying Keaton to a lower level with lower compensation or eliminating his position, Lucent assigned Keaton to the classification of "Property Manager." This description most closely fit his duties and allowed him to maintain his B-level designation and to stay at his same compensation level. Keaton retained this title until his termination in December 2004.

---

[1]     At Lucent, managers are designated from lowest to highest at levels "A" through "E"; Officers are designated "O."

In 2002, Lucent bought the property which houses its Columbus operation from a company known as Celestica. Prior to the purchase by Lucent, Celestica managed the property. After Lucent purchased the property from Celestica, Lucent contracted with a company, Cushman & Wakefield ("C&W"), to provide varying levels of property management and property services for its facilities in Columbus. Since 2002, C&W has managed the entire Columbus physical plant including items related to the building's structure, boilers, air units, out buildings, parking lot, snow removal, janitorial and grounds maintenance. C&W was also responsible for security which required it to have the master keys to the Columbus Lucent facility.[2]

When Keaton's title changed to Property Manager, his duties remained the same as they were prior to the title change. According to his job description as Property Manager, Keaton was responsible for the following duties:

> Manages real estate properties, including management of revenues, expenses, customer relationships, communications, and contract administration through the management a subordinate staff of employees. Analyzes and interprets business proposals, layout design, customer trends and needs, tenant/vendor compatibility, project phasing, capital and operating expenses and revenue projections. Responsible for managing outsourced services.

(Keaton Aff., ¶ 13; Pl's Exh. D.)

Lucent's economic condition declined dramatically in the years following Keaton's settlement of his first lawsuit in 1998. As a measure of that decline, Lucent's job force reduced by 100,000 employees: in 2000 Lucent employed approximately 135,000 employees throughout

---

[2]     Lucent also has contracts with C&W's with respect to it Lisle and Naperville facilities, which were much more limited in scope and did not involve daily management of the physical facility. Its tasks at that Lisle-Naperville facilities were limited to management of isolated construction and maintenance projects. Ed Goldston, an African American male and Lydia Hughes (Caucasian female) were the property managers of the Naperville and Lisle facilities.

the nation; as of late 2004, Lucent employed only 35,000.

In November 2004, Lucent eliminated Keaton's position as a real estate manager at the Columbus facility. Lucent maintains that Keaton's position was eliminated because of a significant decrease in the number of employees who reported to Keaton, from 150 associates and 5 supervisors in March of 2001 to 22 associates and 1 supervisor in November of 2004.[3] These employee positions were eliminated or their jobs reassigned because the need for their work decreased as the Columbus facility property-management functions at Lucent were contracted out to C&W.[4]

Prior to Plaintiff's termination, Lucent conducted employee evaluations at the end of each fiscal year. In this evaluation process, real estate managers received rating bands for their performance between 1 and 5, with 1 being the highest rating of a "role model" and 5 being the lowest. A rating of 3 is considered acceptable. Supervisors were required to limit the number of employees rated at band 1. Once a band was assigned, the company assigned a reference rate, which is made up of factors unrelated to the employee's performance, such as a comparison of the employee's compensation level with other employees employed in similar positions in companies other than Lucent. An employee who was already paid above the market rate for his

---

[3]     As the business outlook for Lucent continued to decline, Lucent implemented a "pooling policy" in which associates began reporting directly to the managers for whom they performed substantive work which decreased the demand and economic justification for middle and upper-management employees.

[4]     At the time Defendant Lucent filed its Motion for Summary Judgment, Keaton had not alleged a claim for wrongful termination. After the parties fully briefed the issues in the Motion, Plaintiff filed an motion for leave to file an amended complaint to assert a claim for wrongful termination. That motion is addressed below. For purposes of the Motion for Summary Judgment, however, Plaintiff argues that his termination is relevant as it relates to the other pre-termination retaliation for the settlement of his previous lawsuit.

or her duties would receive a lower percentage increase than an employee in the same pay band making below the market rate.

Keaton contends that in 1999, his supervisor, Pam Free, lowered his rating "for no good reason" from a 1 to a 2. (Pl's Memo. in Opp., at p. 11.) After discussions with upper management and Lucent's legal counsel, the rating was changed to a level 1. Again, during the 2000 evaluation period, Free graded Keaton at a level 2. Keaton protested to upper management, and again his rating was increased to a level 1. Due to economic conditions, Lucent did not conduct performance appraisals or award any compensation increases Keaton or any other employee for fiscal year 2001.

When Cameron became Keaton's immediate supervisor in latter part of fiscal year 2002, he contacted Keaton's former supervisor, Ken Wells, regarding Keaton's performance. Based on Wells' comments and his own observations, Cameron evaluated Keaton as a band 3.[5] A 3-level band represented acceptable performance, or, put another way, a "good solid performer." Again, in the year 2003, Keaton also received a rating at band 3 and received a percentage increase.[6]

Cameron was not aware of Keaton's former lawsuit at any time before the 2002 evaluation process. Cameron learned of the prior lawsuit during meetings regarding Keaton's challenge to his 2002 evaluation and rating at a band 3. During these meetings with Keaton's supervisor and the Human Resources Manager, one of the managers raised the issue of Keaton's prior lawsuit

_____

[5] Cameron rated the Lisle/Naperville property managers, Ed Golston, an African American, at a band 1, and Lydia Hughes, a white female, at a band 2. The evaluation committee lowered Goldston's evaluation to a band 2.

[6] Lucent also submits that Keaton's evaluations in 2002 and 2003 minimally impacted his compensation increases because he was already being paid above the market rate in those years. (Cameron Aff., ¶¶ 11, 16.)

and specifically inquired as to whether his settlement agreement included a guarantee that he would be evaluated at a band 1 in all subsequent years. Cameron contacted a Lucent attorney to inquire and in so doing learned that no such guarantee existed. Keaton's performance evaluation as a band 3 for fiscal year 2002 was therefore not amended.

Keaton received the following performance ratings and salary increases after the settlement of his first lawsuit in 1998:

| Year | Band | % Salary Increase |
|------|------|-------------------|
| 12/01/1998 | 1 | 3.672% |
| 12/01/1999 | 1 | 3.306% |
| 12/01/2000 | 1 | 2.514% |
| 2001[7] | -0- | -0- |
| 10/01/2002 | 3 | 1.561% |
| 10/01/2003 | 3 | 2.2% |

This performance evaluation system is generally guided by Lucent policies referred to as the Lucent Global Performance Platform ("GPP"), the Lucent Technologies Personnel Guide and the Lucent Supervisor's Guide to Performance and Compensation Review ("Personnel Guide"). The Section of the Personnel Guide relating to professional compensation describes the compensation guidelines for Lucent employees covered by the Management Pay Plan ("MPP"), including Keaton. This section provides in part:

> The contents of this section do not create an expressed or implied contract of employment or set forth employment terms between Lucent Technologies and any employee, and do not create any rights on behalf of employees nor obligations on

---

[7]     Due to economic hardships, no one at Lucent received a pay increase in the year 2001. Keaton does not contend that this failure of Lucent to provide a pay increase in 2001 is related to his claims.

behalf of Lucent Technologies. Lucent Technologies retains discretion to amend or change the compensation plan at any time, with or without notice.

(Cameron Aff., ¶ 16; Def's Exh. G.)[8]

Keaton alleges that the disturbing manner in which Lucent treated him since 1998 has caused him to suffer escalating emotional distress and trauma. His treating psychologist, Dr. Deryck D. Richardson, first diagnosed Keaton as suffering from post-traumatic stress disorder as he would recall the facts surrounding his first lawsuit with AT&T/Lucent. With treatment, Keaton improved. After Cameron became Keaton's supervisor, however, Richardson diagnosed Keaton with an adjustment disorder with mixed emotional features of anxiety and depression as his feelings of being treated unfairly occurred more frequently. In late 2004/early 2005, Keaton began taking prescription drugs for his depression and anxiety such as Zoloft, Lexapro and then Tranxene. Keaton continues to receive psychological treatment.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any

---

[8]     Similarly, the Supervisor's Guide for 2002 provided as follows:

This guide is provided for informational purposes only. It is not a binding contract, and it is not meant to impose any legal obligation upon readers or Lucent or any subsidiary or affiliate. Nor do the compensation and performance management program described in this guide imply or create a binding contract of employment between Lucent, or any subsidiary or affiliate and any employee. No one is authorized to provide any employee with an employment contract concerning the terms or conditions of employment unless the contract is in writing and signed by an authorized corporate representative. Employment with the company is "at will" and may be terminated at any time with or without cause or notice by the employee or the company, except as provided by the terms of any applicable written employment contract or collective bargaining agreement.

(Keaton Dep. III, Ex. 25, p.2.)

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.
P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact,
which may be accomplished by demonstrating that the nonmoving party lacks evidence to support
an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart
v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary
judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt
as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586
(1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment
will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248 (1986).

   In evaluating a motion for summary judgment, the evidence must be viewed in the light most
favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see
Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must
draw all reasonable inferences in favor of the nonmoving party and must refrain from making
credibility determinations or weighing evidence). In responding to a motion for summary judgment,
however, the nonmoving party "may not rest upon its mere allegations . . . but . . . must set forth
specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);*see Celotex*, 477
U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence
of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient;
there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*,
477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*,

475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

## III.

Keaton asserts four interrelated claims against Lucent:  (1) breach of the anti-retaliation provision contained within the settlement agreement from his previous lawsuit; (2) breach of implied contract and promissory estoppel; (3) race discrimination under Title VII, 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981; and Ohio Rev. Code § 4112.02; and (4) intentional infliction of emotional distress.[9]

### A.      Breach of Contract and Retaliation

Defendant-Lucent asserts that Keaton cannot satisfy the elements of his claims for breach of contract and retaliation.  Keaton claims that Lucent breached the anti-retaliation provisions of the 1998 Settlement Agreement by retaliating against him for having pursued his first lawsuit. Lucent contends that, by the terms of the agreement, Keaton's claims for breach of the anti-retaliation provision of the prior Settlement Agreement may only be based on the anti-retaliation provisions of Title VII and the other enumerated statutes.[10]  As such, Lucent argues that Keaton's breach of contract claim is therefore duplicative of his retaliation claim under Title VII. Moreover, Lucent contends that Keaton's breach of contract claim therefore fails because Keaton

---

[9]      Keaton "accepts that discovery has presented insufficient evidence to demonstrate the specific requirements of Keaton's defamation claim." (Memo. in Opp., at p. 8.)

[10]      Paragraph 11 of the Settlement Agreement provides that "Lucent Technologies, Inc. recognizes its obligations under the common and statutory law of the United States and the State of Ohio, including the statutes set forth in Paragraph (8) [Fair Labor Standards Act, the Civil Rights Acts of 1866, 1964 and 1991, the ADEA, the Rehabilitation Act, the ADA, the FMLA and handicap, age and all other discrimination under Ohio Rev. Code Chapter 4112] not to take any adverse employment action against or retaliate against KEATON as a result of this litigation or settlement agreement." (Def's Exh. A, ¶ 11.)

did not exhaust his administrative remedies.

Lucent maintains that, in order to show that it breached the Settlement Agreement by retaliating against him, Keaton must prove retaliation in violation of Title VII. The Court disagrees that Keaton's state law breach of contract count is a merely duplicative of his Title VII claim but agrees that Keaton must prove retaliation in order to establish a breach of the anti-retaliation provision.

Keaton must prove retaliation in order to prove that Lucent breached its agreement to refrain from taking "any adverse employment action against or retaliat[ing] against" him. (Settlement Agmt, ¶ 11.) To support his claim for breach of contract, Plaintiff must prove (1) the existence of a contract; (2) performance by Plaintiff; (3) breach by Defendant; and (4) damage or loss to Plaintiff. *Doner v. Snapp*, 98 Ohio App.3d 597, 600, 649 N.E.2d 42, 44 (Ohio Ct. App. 2d Dist. 1994). In effect, Keaton must prove retaliation if he is to establish the breach element of his *prima facie* case.

Plaintiff's breach of contract and Title VII retaliation claims are, nonetheless, interrelated. Keaton alleges in his Complaint with respect to his claim under Title VII:

> Lucent's conduct as described in the Complaint since the time of the settlement agreement discriminated against Plaintiff with respect to the terms, conditions, and privileges of employment because of Plaintiff's race and color. Due also to his race and settlement agreement and claims Keaton filed which led to the settlement agreement, Plaintiff has been treated differently that Caucasian employees and has been subjected to unequal and unfair terms and conditions of employment.

(Complaint, ¶ 50.) To establish a *prima facie* case of reprisal discrimination under Title VII, a plaintiff must prove that: (1) he engaged in a protected activity; (2) the defendant had knowledge of the protected activity; (3) he subsequently suffered an adverse employment action; and (4) there

-11-

is a causal link between the protected activity and the adverse action. 42 U.S.C. § 2000e-3(a); *Christopher v. Stouder Memorial Hosp*, 936 F.2d 870, 877 (6th Cir.1991) (citing *Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir.1987)). Once a plaintiff has made a *prima facie* case of discrimination, the defendant must then articulate a legitimate, non-discriminatory reason for the employment action. *McDonnell-Douglas v. Green* , 411 U.S. 792, 802 (1973). After the legitimate, non-discriminatory action has been articulated, to prevail, the plaintiff then must show that the defendant's proffered reason for the employment action was really a pretext for unlawful discrimination. *Id.*; *Reeves,* 530 U.S. at 144.

### 1.    No Adverse employment actions

Keaton's claims for breach of the anti-retaliation provisions in the 1998 Settlement Agreement and for retaliation under Title VII fail because he cannot establish adverse employment action.[11]  Not every act that impacts an individual's employment rises to the level of an adverse employment action. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). A *de minimus* employment decision is not sufficient to support a Title VII claim.   *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 796 (6th Cir. 2004)(en banc).  Rather, an adverse employment action must work a "materially adverse change in the terms and conditions of [plaintiff's] employment."  *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (1999).  In contrast, "reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th

---

[11]    Keaton has moved for leave to amend his Complaint to add a specific claim for wrongful discharge resulting from his termination of employment in November 2004.  That motion is addressed separately below.

Cir. 1996). Such reassignments may be considered adverse employment actions, however, if they function as a demotion, evidenced by "a less distinguished titled, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Id.* at 886. Mere inconvenience or an alteration of job responsibilities is insufficient to constitute adverse employment action. *Id.*

Keaton does not contend, and has not adduced evidence to suggest, that he was demoted, received a decrease in wage or salary, was downgraded to a less distinguished title, incurred a material loss of benefits or had his job responsibilities significantly diminished. Keaton's alleged instances of adverse treatment did not diminish his material job responsibilities. The only repercussions that Keaton can identify relate to his contentions that he did not perform certain job duties that were assigned to other entities, primarily to Celestica and C&W as these were the contracted property management companies.[12] Plaintiff Keaton cannot create adverse employment action by mischaracterizing instances in which he desired to add C&W's property management responsibilities to his own job duties as evidence that those responsibilities were taken away from him by his supervisors.

Keaton recognizes that C&W was the manager of Lucent's Columbus physical property and that, beginning in 2001, Celestica was responsible for the property prior to C&W. (Keaton Dep., at 286-87.) As such, from 2001 through his termination in November 2004, Keaton never maintained management responsibility for the Columbus physical plant. As a result, many of Plaintiff's complaints and allegations of adverse action cannot stand. For instance, because he did not manage

---

[12]     The Court has reviewed in detail all of the allegations which Keaton asserts as support for his claim that he was not permitted to perform certain job duties as set forth on pages 12 through 17 of his Memorandum in Opposition. The list of these allegations is attached hereto as Appendix A.

the property, Keaton could not manage the physical plant budget, hold the master keys to the facility, nor control the work of the contractor's employees, including C&W's employees such as Bill Willard. [13] Plaintiff did not have his property management responsibilities decreased; he instead did not receive the increased job duties that he desired because they were assigned to an outside contractor.

Keaton's other allegations do not suffice to establish adverse action. For example, Keaton contends that, some time prior to 2002 when Celestica owned the building, during a meeting involving Bill Willard and another employee, Kevin Johnson of corporate security, someone said that Keaton was setting up a "theifdom" at the office. Keaton perceived this comment as an accusation that he was a thief and a remnant of his prior, settled litigation in which he was accused of stealing a computer. (Keaton Aff. ¶ 50; Keaton Depo., pp. 473-87, 599.) Keaton cannot attribute this comment to anyone in general and no one at Lucent in particular. Keaton also suggests in his affidavit that his office was searched on multiple occasions. (Keaton Aff., ¶ 50.) The Court has reviewed the deposition transcript to which Keaton refers on this subject and does not find any references to searches of Keaton's office. Moreover, this type of allegation in an affidavit, unsupported by reference to who conducted the search or when, is not sufficient to satisfy the requirements of sound evidence under Rule 56(e). Plaintiff does not, for example, indicate if the searches were conducted by co-workers or supervisors, nor does he disclose any surrounding

---

[13]     During 1998 or 1999, after the settlement of the prior lawsuit, William Willard told Keaton that he and other Lucent security personnel would not forget what Plaintiff had done to them. Willard was then Lucent's facilities manager. Keaton had referenced, although did not name Willard in his prior lawsuit as someone who had mistreated him. Willard also told Plaintiff that "paybacks are hell." Keaton took Willard's comments to mean he would suffer paybacks and repercussions in the work environment because of the prior lawsuit. As early as 2001, however, Willard worked for Celestica and did not report to anyone at Lucent.

circumstances or adverse consequences he may have suffered.

Furthermore, Keaton's lower-than-desired performance evaluations do not constitute adverse employment actions. Keaton asserts that, post settlement of his 1998 case, and in particular, during the years 2002 and 2003, Lucent provided him with low performance evaluations and, in turn, denied him the level of compensation increases to which he believed he was entitled.[14]

Keaton agrees that he received high ratings and corresponding wage increases in the years 1998, 1999 and 2000. Plaintiff also admits that he received "acceptable" ratings and salary increases in the years 2002 and 2003.[15] Plaintiff contends, however, that he should have received higher increases in the years he was rated at the highest "role model" level and that he was entitled to a "role model" rating of 1 in the years 2002 and 2003. He therefore concludes that he deserved a higher percentage of wage increases in all of the years after his settlement.

Keaton's performance evaluations and subsequent salary increases were not adverse employment action. Even the mid-range performance ratings do not rise to the level of an adverse employment action under these circumstances. *Primes v. Reno*, 190 F.3d 765, 767 (6ᵗʰ Cir. 1999); *Logan v. Henderson*, 2002 WL 484631, *4 (S.D. Ohio Feb. 12, 2002)(unreported)(Sargus, J.). "If every low evaluation or other action by an employer that makes an employee unhappy or resentful

---

[14]    In particular, Keaton contends that when he received a rating of 1, he should have received a 5% increase. During the years he was rated at 3, he contends he should have been rated at 1 and received a 5% increase for those years as well. Keaton computes his damages for loss of salary for not being paid at band 1 at $114,900. (Keaton Aff., ¶ 57-60; Exh. A-2.)

[15]    Again, due to economic circumstances, no Lucent employees received salary increases in the year 2001. Keaton does not suggest that the failure to receive a pay increase in 2001 constitutes adverse employment action.

were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure." *Id.* "Paranoia in the workplace would replace the *prima facie* case as the basis for a Title VII cause of action." *Id.*; *see also Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998) (if negative performance evaluation were deemed actionable as "retaliation," it would "send a message to employers that the slightest nudge or admonition . . . can be the subject of a federal lawsuit"); *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996) (holding low performance evaluation and consequent ineligibility for discretionary bonus not actionable adverse employment action); *Montandon v. Farmland Industries, Inc.*, 116 F.3d 355, 359 (8th Cir. 1997) (finding lower performance evaluation not basis for any action by employee and not "adverse employment action"); *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir. 1994) (same).  Plaintiff's disagreement with the accuracy and fairness of his performance evaluations suffers from the same shortcomings.  The Court finds no adverse employment action in Keaton's performance evaluations, all of which resulted in pay <u>increases</u>, other than in year 2001 when all employees had their pay frozen.

To the extent Keaton complains that the amount of the salary increases he received was less than other employees received, he has presented no evidence that the increase was below the range for which he was eligible.  Moreover, a pay raise within the applicable range but less than the Keaton subjectively believed he deserved is not materially adverse employment action under the circumstances presented in this case. *Thomas v. Compuware Corp.*, 2004 WL 1664042 *4 (6th Cir. July 23, 2004)(unreported)(citing *Kocsis*, 97 F.3d at 886-87)(". . . a pay raise within the applicable range but less than the employee subjectively believes she deserved, [does not] constitute[] a 'materially adverse employment action.'"); *see also Tademe v. State Cloud State Univ.*, 328 F.2d

982, 993 (8th Cir. 2003)(finding decision not to raise black assistant university professor's salary was not adverse employment action that would support retaliation claim because his salary was not decreased or otherwise diminished in any way, and record showed he received regular salary increases); *Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997)(determining plaintiffs did not prove actionable employment action where they were not awarded merit pay increases in the same amount as others or in the amount to which they subjectively believed they were entitled); *Bickerstaff v. Vassar College*, 354 F. Supp.2d 276, 280-81 (S.D. N.Y. 2004)(holding that, small salary increases are, by definition, not reductions in wages, and thus are not adverse actions for purposes of Title VII).

The elimination of Keaton's job could constitute an adverse employment action. Plaintiff, however, has not asserted an independent claim that the elimination of his position was in retaliation for filing the prior (or instant) lawsuit. Instead, Keaton maintains that the retaliation is evidenced by a series of adverse actions, culminating his supervisors taking away over 70 his subordinate employees and 93 contractors such that Lucent could no longer economically justify his position. Plaintiff merely offers the raw number of employees who were laid off or transferred out from his managerial control as proof of retaliation. Plaintiff does not offer any evidence or argument to dispute Lucent's position that it laid off over 100,000 employees due to its struggling economic conditions. Plaintiff does not question Lucent's contention that, as a result of the sale of the property sale to Celestica and then the property management contract with C&W, numerous real estate positions in Columbus were eliminated. Plaintiff has not offered any evidence that Lucent was carrying out a retaliatory motive over the years following his settlement. Moreover, as set forth more fully below, there is no causal connection in the sense that no

temporal proximity exists between the elimination of his position in 2004 and the settlement of his claim in 1998.

In sum, Lucent continuously employed Plaintiff for approximately seven years after the settlement of his prior lawsuit and provided pay increases during each of those years since 1998 in which raises were afforded to any other Lucent employee. Moreover, Keaton's allegations of diminished responsibilities do not qualify as adverse employment actions. Instead, Keaton enjoyed average to high evaluations and consistent salary increases. Accordingly, viewing the evidence as a whole and in a light most favorable to Plaintiff as the non-moving party, Keaton has not demonstrated that he was subjected to adverse employment action. Lucent is therefore entitled to summary judgment on both his retaliation claim under Title VII and his interrelated state law breach of contract claim.

### 2.     No causal connection

Even if the average performance evaluations in 2002 and 2003 along with his perceived diminution of job duties could suffice, Keaton cannot demonstrate a causal connection between his protected activity (settlement of the lawsuit) and these allegedly adverse employment actions.

In order to demonstrate retaliation, Keaton must prove, among other factors in his *prima facie* case, a causal connection between the protected activity and the adverse employment action. *Christopher v. Stouder Memorial Hosp*, 936 F.2d at 877 (noting causal connection is fourth element of *prima facie* case). A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation. *Wrenn*, 808 F.2d at 501 (citing *Burrus v. United Telephone Co.*, 683 F.2d 339, 342 (10th Cir.1982)). Temporal proximity alone, however, will not support an inference

-18-

of retaliatory discrimination when there is no other compelling evidence. *See Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir.1986) (citing *Brown v. ASD Computing Center*, 519 F.Supp. 1096, 1116-17 (S.D. Ohio 1981)).

Here, Keaton has failed to set forth any direct evidence of causation, nor has he set forth evidence creating an inference of a causal connection. Keaton's complaints regarding his performance ratings and resulting lower-pay increases relate the years 2002 and 2003. His 2002 performance evaluation occurred more than 4.5 years after the settlement of his prior lawsuit; his 2003 evaluation occurred more than 5.5 years after the settlement. The vast majority of Keaton's alleged diminished job responsibilities occurred more than 4 years after the settlement. Under these circumstances, the requisite temporal proximity to justify an inference of a causation so as to prove retaliation is lacking.

Because Keaton cannot demonstrate a *prima facie* case of retaliation, Lucent is entitled to summary judgment as a matter of law. Because the Court arrives at this conclusion as to Keaton's *prima facie* case, it will not address Lucent's contentions regarding its legitimate reasons for its actions and lack of pretext.

**B.      Promissory Estoppel and Implied Contract**

Keaton also alleges a claim for promissory estoppel and breach of implied contract. In support of his claim for promissory estoppel, Plaintiff alleges that Lucent breached its promises, representations and customs by not adhering to all aspects of its Global Performance Platform when evaluating his work performance in the years 2002 and 2003.

In *Mers v. Dispatch Printing Co.*, 19 Ohio St. 3d 100, 104, 483 N.E.2d 150 (Ohio 1985), the Supreme Court of Ohio recognized that employee handbooks, company policy and oral

-19-

representations may give rise to implied or express contractual provisions that alter the terms of an oral at-will employment relationship. *Id.* An employer's right to discharge an employee may also be limited by representations or promises made to the employee which fall within the doctrine of promissory estoppel. *Id.*

> [T]he doctrine of promissory estoppel is applicable and binding to employment-at-will relationships when a promise which the employer should reasonably expect to induce action or forbearance on the part of the employee does induce such action or forbearance, if injustice can be avoided only by enforcement of the promise. The test in such cases is whether the employer should have reasonably expected its representation to be relied upon by its employee and, if so, whether the expected action or forbearance actually resulted and was detrimental to the employee.

*Kelly v. Georgia-Pacific Corp.*, 46 Ohio St.3d 134, 139 545 N.E.2d 1244, 1250 (Ohio 1989). Similarly, with respect to Keaton's implied contract claim, "the 'at-will' concept is only a *description* of the parties' prima facie employment relationship. It intimates nothing about subsidiary contractual arrangements (express or implied) to which an employer may legally obligate [itself] by adding to that relationship new terms and conditions." *Helle v. Landmark, Inc.*, 15 Ohio App.3d 1, 8, 472 N.E.2d 765, 773 (Ohio Ct. App. 6th Dist. 1984). "When such oral or written modifications of the original employment contract satisfy the paradigm elements essential to contract formation--*i.e.*, offer, acceptance, consideration-- binding obligations arise." *Id.*

In order to determine whether an at-will employment has been altered by an implied agreement, the court must look to the history of relations between the employer and employee and the facts and circumstances surrounding the employment-at-will relationship. *Mers*, 19 Ohio St. 3d at 104. The facts and circumstances surrounding the employment include "the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact

-20-

which may illuminate the question." *Id*. The Court must consider other factors, including information contained in employee handbooks, oral representations made by supervisory personnel that employees have been promised job security in exchange for good performance, and written assurances reflecting company policy. *Wright v. Honda of Am. Mfg., Inc.* ,73 Ohio St.3d 571, 574-575, 653 N.E.2d 381, 384 (Ohio 1995). "Generally, items such as employer handbooks, company policy or oral representations do not create employee rights which alter the at-will nature of employment unless the parties have a 'meeting of the minds' indicating that such items are to be considered valid contracts altering the terms for discharge. *Bartlett v. Daniel Drake Memorial Hospital*, 75 Ohio App.3d 334, 599 N.E.2d 403 (Ohio Ct. App. 1st Dist. 1991).

In support of his promissory estoppel and implied-contract claims, Keaton maintains that Lucent did not adhere to all aspects of its Global Performance Platform ("GPP") when evaluating his performance for the years 2002 and 2003 when he was given a rating of 3 as opposed to a top-level 1. He asserts that Lucent did not set objectives at the beginning of the fiscal year, did not provide a mid-year review of his accomplishments compared with these objectives and was not informed of any difficulties with his performance prior to the rating. Keaton maintains that the practice of following these procedures in the GPP were mandatory and that managers were reminded to complete the GPP forms and had an on-line certification process to validate that each manager had followed the plan.

Plaintiff provides no evidence, however, that he and Lucent had any kind of agreement or understanding that the statements in the company's compensation plans and policies set forth in the various supervisor handbooks created a clear and unambiguous promise. The GPP was part of a more comprehensive series of pay evaluation guidelines combined into the Supervisor's Guide

-21-

to Performance and Pay Review. This Guide expressly refers to the GPP as merely a guideline to assist supervisors in their task of evaluating employees. These policies and compensation plans clearly and unambiguously prescribe against Keaton's arguments of promissory estoppel and implied contract because each document states that it should not be construed as a binding contract of employment. Any reliance by Keaton to the contrary that the representations created a promise, therefore, would have been unreasonable.

Keaton has failed to demonstrate that there was a promise, clear and unambiguous in its terms, that he would be evaluated by his supervisor, particularly in a way in which he would receive the highest performance level. Further, given the numerous instances in the supervisory handbooks which dictate that the policies are provided as "guides," "for informational purposes only," and are not "binding contract[s]," Keaton has not established that his reliance was reasonable. Lucent is therefore entitled to summary judgment on this claim as well.

## C.    Race Discrimination

Absent direct proof, federal courts analyze race discrimination claims arising under Title VII, Section 1981,[16] and Ohio's anti-discrimination statute, Ohio Rev. Code § 4112.02, using the well-established burden-shifting analysis of *McDonnel- Douglas,* 411 U.S. at 802. Plaintiff bears the initial burden of establishing a *prima facie* case by adducing evidence which, if not explained, gives rise to an inference of unlawful discriminatory activity on the part of the employer.    *Id.* Because Keaton does not offer direct proof of race discrimination, in order to prove a prima facie

---

[16]      It is unclear whether Plaintiff intends to proceed on his Section 1981 claim. Keaton mentions the statute only in passing in his Complaint as a basis for jurisdiction and does not address the claim in his Memorandum in Opposition. In all events, the claim would fail for lack of adverse employment action.

case, he must demonstrate that (1) he is a member of a protected class; (2) he was qualified for the job; (3) he suffered adverse employment action; and (4) non-members of the protected class were treated more favorably than Keaton. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

Certainly Keaton satisfies the first two elements of his prima facie case: as an African-American, he is a member of a protected class and he was qualified for the jobs he held at Lucent. Because the Court has concluded that Plaintiff fails to demonstrate adverse employment action, however, his claims for race discrimination likewise fail. Lucent is therefore entitled to Summary Judgment on this claim.

**D.     Intentional Infliction of Emotional Distress**

Keaton also maintains that the disturbing manner in which Lucent treated him since 1998 has caused him to suffer escalating emotional distress and trauma culminating in an adjustment disorder with mixed emotional features of anxiety and depression. Under Ohio law, "'[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.'" *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (Ohio 1983) (citation omitted). The Ohio Supreme Court has described conduct that is "extreme and outrageous":

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is

-23-

> one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Yeager*, 6 Ohio St.3d at 374-75, 453 N.E.2d at 671 (citations omitted).  Thus, Ohio courts have adopted the standard for intentional infliction of emotional distress outlined in the Restatement (Second) of Torts and construe the concept of extreme and outrageous conduct narrowly.  *See Baab v. AMR Services Corp.*, 811 F.Supp. 1246, 1269 (N.D.Ohio 1993).  According to this standard, in order to prove a claim, a plaintiff must show: (1) the actor intended to cause or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; (2) the actor's conduct was so extreme and outrageous to go beyond all possible bounds of decency; (3) the actor's actions were the proximate cause of plaintiff's psychic injury; and (4) the mental anguish suffered by plaintiff is serious and of a nature that no reasonable man could be expected to endure it. *E.g., Pyle v. Pyle*, 11 Ohio App. 3d 31, 34, 463 N.E.2d 98, 103 (Ohio Ct. App. 8th Dist. 1983).

An employment discrimination claim, standing alone, does not rise to the level of "extreme and outrages conduct" necessary to support a claim of intentional infliction of emotional distress. *See Godfredsson v. Hess & Clark* , 173 F.3d 365, 376 (6th Cir. 1999)(noting that employee's termination, even if based upon discrimination, does not rise to the level of "extreme and outrageous conduct" without proof of something more).  "If such were not true, then every discrimination claim would simultaneously become a cause of action for the intentional infliction of emotional distress." *Id*.

While his psychological impairments as diagnosed by his treating psychologist are no doubt unfortunate, Keaton has not demonstrated that Lucent's conduct was outrageous in character and

went beyond all possible bounds of decency. Keaton disagreed with his evaluations; he desired but did not receive additional job duties; he did not feel that Lucent allowed him to perform his entire job function and allowed employees of its contractors to disrespect him; and he maintains that Lucent would not provide him with the proper support to perform his job. Given the difficult standard with which Ohio courts measure extreme and outrageous conduct, and interpreting all of the facts in favor of Plaintiff, the Court cannot say Keaton has adduced any evidence to suggest that Lucent acted atrociously or in an utterly intolerable manner.

For these reasons, Lucent is entitled to summary judgment on Plaintiff's claim of intentional infliction of emotional distress.

## IV.

## MOTION TO AMEND

On May 13, 2005, Plaintiff Keaton filed a Motion for Leave to Amend Complaint to assert a claim for wrongful termination. Keaton notes that the original complaint in this matter was filed on September 30, 2003. After the complaint was filed, Lucent terminated Keaton's employment, on or about November 15, 2004. Keaton maintains that the issue of termination is merely part and parcel of the claims he already alleged in the original complaint, the parties already had discovery on the issue and they briefed it with respect to Lucent's motion for summary judgment. He now seeks leave to assert an independent claim for wrongful termination.[17]

Federal Rule of Civil Procedure 15(a) permits a party to amend the complaint after a

---

[17]     The Court notes that Plaintiff may have intended to withdraw the motion to amend. In response to Lucent's motion *in limine* on the subject, Plaintiff indicates that "if it is the wrongful discharge claim Defendant is concerned with, that portion of the requested amendment can be withdrawn." (Pl's Resp. to Def's Mot. in Limine, May 27, 2005 at p. 5.)

responsive pleading has been filed only by leave of court, but requires that such leave be freely granted "when justice so requires." Fed.R.Civ.P. 15(a).[18] The Supreme Court construed this standard in *Forman v. Davis*, 371 U.S. 178, 182 (1962):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason– such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of amendment, etc.,– the leave sought should be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court.

Keaton originally filed this action on September 30, 2003. Plaintiff was notified on November 14, 2004 that his position was being eliminated. At the time he received his notice, there were more than 8 weeks remaining in the discovery period. Defendant's Motion for Summary Judgment was fully at issue when Plaintiff filed the request for leave to amend his complaint.

Lucent argues that Keaton's attempt now to amend the complaint is a dilatory and that leave to amend should be denied because to do so with respect to the proposed claim would be futile.

Delay alone is not a ground for denying leave to amend. *Dana Corp. v. Blue Cross & Blue*

---

[18] The Rule provides in pertinent part:

A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders.

Fed.R.Civ.P. 15(a).

*Shield Mut.*, 900 F.2d 882, 888 (6th Cir. 1990). The party opposing leave to amend must demonstrate significant prejudice. *Duggins v. Steak N' Shake*, 195 F.3d 828, 834 (6th Cir. 1999). The Court determines prejudice by considering "whether the assertion of the new claim or defense would: require the opponent to expend significant additional resources to conduct discovery and prepare for trial; significantly delay the resolution of the dispute; or prevent the plaintiff from brining a timely action in another jurisdiction." *Phelps v. Mclellan,* 30 F.3d 658, 662-63 (6th Cir. 1994). A party who moves to amend late in the lawsuit has "an increased burden to show justification to move earlier." *Wade v. Knoxville Util. Bd.*, 259 F.3d 452, 459 (6th Cir. 2001)(citation omitted). Courts have frequently found prejudice where the request for amendment has come after the discovery deadline, *e.g., Duggins*, 195 F.3d at 834, or on the eve of trial. *Ferguson v. Neighborhood Housing Servs., Inc.*, 780 F.2d 549 (6th Cir. 1986).

Here, although the request for amendment is clearly made after the close of discovery and on the eve of trial, Lucent admits that the issue of Plaintiff's termination has been intertwined with the claims presented in his original complaint. As such, although Lucent may not have had as much discovery on the claim as it would like, even if there is prejudice, the Court could fashion some type of remedy which would alleviate the impact of prejudice and permit the amendment. *Janikowski v. Bendix Corp.*, 823 F.2d 945, 952 (6th Cir. 1987).

The Court finds a more serious hurdle to the amendment in Defendant's arguments of futility. A court may deny amendment if to do so would be futile. An amendment is futile if the proposed claims could not withstand a motion to dismiss under Fed. R. Civ. P. 12. *Neighborhood Dev. Corp. v. Advisory Council on Historic Preservation*, 632 F.2d 21, 23 (6th Cir.1980); *Matthews v. Jones*, 35 F.3d 1046, 1050 (6th Cir.1994).

-27-

The Court notes, as Defendant has asserted in its memorandum in opposition to Plaintiff's Motion for Leave to Amend, that Plaintiff recently filed another administrative charge with the Equal Employment Opportunity Commission advancing the same wrongful termination claims as he asserts for his proffered amended complaint. Clearly, Plaintiff has not exhausted his administrative remedies with respect to his wrongful termination claim. As such, if the Court granted Plaintiff's Motion to Amend, it would be immediately subject to dismissal for failure to exhaust. *See United Airlines v. Evans*, 431 U.S. 553, 557 (1977)(plaintiff must exhaust administrative remedies prior to advancing claims of race discrimination and claims under Title VII).

Under these circumstances, Lucent no doubt would subject Plaintiff's claim to a procedural mechanism of a motion to dismiss. Because it appear that Plaintiff has not exhausted his new claim and therefore no set of facts could be proven to support it, leave should be denied. *Brown v. Worthington Steel*, 211 F.R.D. 320, 323 (S.D. Ohio 2002)(Sargus, J.)(citing *Cooper v. American Employers' Ins. Co.*, 296 F.2d 303, 307 (6th Cir.1961)). By this ruling, however, the Court does not pass on the validity of any such claim should Plaintiff later present it as an subsequent independent lawsuit.

## V.

For the foregoing reasons, Lucent's Motion for Summary Judgment (Doc. #43) is **GRANTED**. Plaintiff's Motion for Leave to Amend Complaint (Doc. #51) is **DENIED**.

**IT IS SO ORDERED.**


_____**June 13, 2005**_____          ___/s/ *Edmund A. Sargus, Jr.*_____
**DATED**                                 **EDMUND A. SARGUS, JR.**
                                          **UNITED STATES DISTRICT JUDGE**

## APPENDIX A

### PLAINTIFF'S ALLEGATIONS OF ADVERSE EMPLOYMENT ACTION

Although part of Keaton's job description was to go in and out of different Lucent doors and areas, he was not given and could not borrow key's to open the 1600 doors under Lucent control and his management. Others, even less senior individuals than Keaton, were allowed to borrow or were given keys to open the doors. (Keaton Depo. p. 440; Keaton Affd. ¶ 16).

Lucent would not require Bill Willard to respond to Keaton's requests for services with respect to restrooms, janitorial, building maintenance, repairs and security as well as other services Keaton was in charge of overseeing with respect to Lucent clients. (Keaton Depo. pp. 134, 171-174, 216; Keaton Affd. ¶ 17).

Job functions performed with approval of Keaton's superiors on multiple occasions were rescinded after hours of effort and due diligence. (Keaton Depo., pp. 162-68; Keaton Affd. ¶ 18).

Keaton's functions were interfered with as a result of the failure of his superiors to communicate with him. (Keaton Depo. pp. 284, 341; Keaton Affd. ¶ 19).

In 2001 when Keaton transferred to Lucent Real Estate and Lucent sold the building to Celestica Keaton was working for Debbie Tracey during part of that year. Tracey was the Lucent facilities operations senior manager. Keaton was the facilities manager. Engineers and support staff worked in the facility operations group. Although Keaton was the new Lucent Real Estate Facilities Manager he was not given any engineers, support staff, documents, drawings, or, system programs to assist his function as a Lucent Real Estate Manager. (Keaton Depo. p. 459; Keaton Affd. ¶ 20).

Bill Willard would not timely or accurately provide "STARS" reports to identify Lucent managers who occupied space (room/labs) for billing proposes. This affected Keaton's job. After informing Lucent they did nothing to resolve this situation. When Willard's report was not timely or accurately provided Keaton was required through much effort and time to develop a totally new report. (Keaton Depo. p. 466; Keaton Affd. ¶ 21).

Lucent's failure to require Celestica and Cushman & Wakefield managers to work with Keaton as part of his job function in overseeing outsourcing, caused unnecessary double work, effort and time with respect to Keaton's job duties. Lucent did nothing when Keaton complained. (Keaton Depo. p. 370; Keaton Affd. ¶ 22).

Cushman & Wakefield was an outsource service provider for Lucent. Although Cushman & Wakefield was under the direction of Colin Cameron, and Keaton was Cameron's only direct report in Columbus, Cameron refused to have Cushman & Wakefield managers communicate with Keaton. As a result Keaton's job duties and responsibilities were negated and circumvented. (Keaton Depo. p. 468-9; Keaton Affd. ¶ 23).

Lucent through its senior managers permitted other managers to assume part of Keaton's job responsibilities, but Keaton was nonetheless held responsible. (Keaton Depo. p. 182, 185-192, 470; Keaton Affd. ¶ 26).

Lucent limited Keaton's ability to perform his job function by applying a "purchasing jail" concept to him. (Keaton Depo. pp. 198, 268, 270, 274; Keaton Affd. ¶27). For example security services was not allowed to report to Keaton. Instead, Lucent had security services report to a subordinate under Keaton, Dale McIlhargie and McIlhargie would then report to Colin Cameron. (Keaton Depo. p. 294).

Colin Cameron, a Lucent Level D Manager, who became Keaton's direct report in July, 2002 and who was also manager of Lucent's Lisle/Napierville facility did not set up management of the Columbus facility in the same manner as he did the Lisle/Napierville facility. Under the "purchasing jail" rule which Cameron established and shared with Keaton and his staff, Keaton was not permitted to discuss or interact on more than a limited basis with Cushman and Wakefield employees. The opposite was true for the property managers of the Lisle/Napierville facility. (Keaton Depo. p. 217-220, 265-66, 268-70, 274, 290; Keaton Affd. ¶ 27; Cameron Depo. Vol. 1, p. 24).

Colin Cameron had weekly discussions with Bill Willard and other Cushman & Wakefield and Lucent Managers as part of the decision making process with respect to operations of the facility and management of the administrative service functions for the Columbus Works but not with Keaton although Keaton was the Lucent Real Estate Manager on site. (Keaton Affd. ¶ 27; Cameron Depo. p. 125, 127, 129).

Colin Cameron (2002 – 2004), Ken Wells (2001-2002), Debbie Tracey (2000 - 2001) and Pam Free (1998 - 2000) which were all Keaton's superiors at the various times indicated since 1998 provided only limited communication with respect to basic as well important managerial decisions, discussions, input and thought processes. (Keaton Depo. pp. 284-292; Keaton Affd. ¶ 28).

In the beginning Colin Cameron met with Keaton only 15 to 30 minutes per week on select issues, then it became every two weeks for 8 to 20 minutes. After that it was only when Colin needed information from Keaton. This is not how Colin related with other managers at Keaton's level. (Keaton Depo. pp. 303-305; Keaton Affd. ¶ 29).

Keaton was not permitted input by his superiors into management of his total Cost Centers budget. (Keaton Depo. pp. 317-320, 331, 334; Keaton Affd. ¶ 30).

Colin permitted Keaton's job function to be managed by other managers and directors. He made decisions about Keaton's job function based upon information he accepted from other managers without Keaton's input. (Keaton Depo. pp. 329-337, 350; Keaton Affd. ¶ 32).

Keaton was excluded from meetings with individuals wherein his job functions, duties and responsibilities were discussed. (Keaton Depo. p. 331, 334; Keaton Affd. ¶ 35).

Labor relations decisions and agreements which as Lucent Real Estate Manager Keaton should have been party to were made without him. (Keaton Depo. p. 331, 334; Keaton Affd. ¶ 36).

Colin Cameron would inform others when he intended to visit Columbus works but would not inform Keaton in advance although Keaton was the Lucent Real Estate Manager on site and Cameron's only direct report. Keaton had to find out information such as this from others and then verify it with Colin. (Keaton Depo. pp. 363-4; Keaton Affd. ¶ 37).

Most decisions concerning Keaton's job functions as a Lucent Real Estate Manager were made without Keaton's input or knowledge. (Keaton Depo. pp. 367, 375; Keaton Affd. ¶ 38).

Keaton's requested involvement in all outsource contracts, which his job description, dictated and which was part of his job function, was not permitted by Colin Cameron. (Keaton Depo. pp. 410, 581-83; Keaton Affd. ¶ 39).

Keaton's input was not permitted or used with respect to his job functions. However, the input of Celestica, Cushman & Wakefield and other Lucent Managers was readily accepted. (Keaton Depo. pp. 265-66, 290, 331; Keaton Affd. ¶ 40, 45).

All Columbus Cushman & Wakefield employees were listed (except managers in Keaton's cost centers) as under Keaton's management. However, Keaton was not allowed to talk to them. This was part of Colin Cameron's "purchasing jail rules". (Keaton Depo. 429, 581-83; Keaton Affd. ¶ 41).

Keaton was not permitted to perform his job responsibilities as listed in the March, 2004 Property Manager job description. (Keaton Depo. pp. 309-10, 331, 334, 581-83; Keaton Affd. ¶42; Exhibit D, Property Manager Job Description).

Colin Cameron's "purchasing jail rule" greatly interfered with Keaton's job functions. Because of those rules Keaton was not allowed to perform his job function. (Keaton Depo. pp. 185-86, 403, 410, 529-30, 581-583; Keaton Affd. ¶ 42, 44).

Keaton was not allowed to provide potential cost savings for Lucent if it involved or had any relationship to the Cushman & Wakefield and Lucent relationship although under the job description Keaton was to oversee outsourcing. (Keaton Depo. pp. 431-433-438; Keaton Affd. ¶ 45).

Keaton was not permitted to meet with, talk with (only on a limited basis) or make any recommendations which involved Cushman & Wakefield operations although real estate managers at other locations were allowed such activities and it was part of Keaton's job duties as a Lucent Property Manager to oversee outsourcing contracts and arrangements. (Keaton Depo. pp. 217-22, 290, 331; Keaton Affd. ¶ 46).

Keaton was continuously harassed by Bill Willard throughout the period 1998 until Keaton was downsized. (Keaton Depo. pp. 484, 487; Keaton Affd. ¶47). Keaton complained to each of his managers throughout this period beginning with Pam Free, and then Debbie Tracey, Ken Wells and Colin Cameron about Willard's harassing and intimidating behavior and asked them to put a stop to it. Nothing was done. Keaton also complained to Celestica Manager Marcel Sharaka, to Lucent's Equal Opportunity Officer Arvene Loring and Lucent Attorney Jim Staleup and nothing was done. (Keaton Depo. 472, 487; Keaton Affd. ¶ 47). Pursuant to Lucent's Code of Conduct immediate steps are required to be taken regarding any harassing, intimidating or offensive conduct towards its employees. (Keaton Depo. pp. 496, 506-07, 513; Keaton Affd. ¶ 48; Exhibit E–Lucent Code of Conduct).

Keaton's employment was threatened on several occasions by his managers Ken Wells and Colin Cameron. (Keaton Depo. pp. 194-196; Keaton Affd. ¶ 49).

False accusations regarding theft were made against Keaton by his Lucent managers Keaton's office was also searched on multiple occasions. (Keaton Depo. pp. 473-487, 599; Keaton Affd. ¶ 50).

Lucent failed to follow its Code of Conduct provisions with respect to threats Keaton received regarding his employment, harassment and intimidation he received on the job and with respect to false accusations of theft. (Keaton Depo. pp. 496, 506-07, 513; Keaton Affd. ¶51; Exhibit E – Lucent Code of Conduct).